UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


C.A. ACQUISITION NEWCO LLC,  )
        Plaintiff            )
                             )
              v.             )  C.A. No. 10-cv-30177-MAP
                             )
DHL EXPRESS (USA), INC.,     )
        Defendant            )


MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND PLAINTIFF'S CROSS-MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS
(Dkt. Nos. 25 & 28)

July 7, 2011

PONSOR, D.J.


## I.   INTRODUCTION

Plaintiff C.A. Acquisition Newco LLC sues Defendant DHL Express (USA), Inc. for, _inter alia_, breaching a 2006 contract between Defendant and Cyphermint, Inc., a software development company whose assets Plaintiff later purchased. Defendant now moves for judgment on the pleadings on all six counts (Dkt. No. 25) and Plaintiff moves for judgment on the pleadings as to Count I (Dkt. No. 28). For the reasons stated below, Defendant's Motion for Judgment on the

Pleadings (Dkt. No. 25) will be allowed as to Count III and otherwise denied.  Plaintiff's Cross-Motion for Partial Judgment on the Pleadings (Dkt. No. 28) will be allowed.

## II.   FACTUAL BACKGROUND

A.   The Parties.

Plaintiff C.A. Acquisition Newco LLC is a Delaware LLC with a principal place of business in New York and is the successor in interest to Cyphermint, Inc. ("Cyphermint" or "CI"), a New York corporation specializing in software development for self-service kiosks.  Defendant DHL Express (USA), Inc. is an Ohio corporation with a principal place of business in Florida.  Defendant is a division of DHL International GmBH, a Deutsche Post Company and express carrier of documents and freight.  Until 2008, Defendant provided express pick-up and delivery, including same-day air delivery, of letters and packages throughout the United States.

B.   The Contract.

On August 1, 2006, Defendant entered into an agreement with Cyphermint, which was memorialized in a Master Services Agreement ("MSA") and Statement of Work ("SOW"),

2

collectively referred to as "the Contract."  Defendant entered into the Contract hoping to expand its customer base by offering domestic shipping services in retail locations, such as Walgreens and OfficeMax, via kiosks, or "Shipping Spots."  Customers were able to use the kiosks' user-friendly touch screens to pay for shipping costs and print shipping labels.  Customers could then leave the labeled package in the designated receptacle for delivery.

The Contract provided for an initial three-year term (August 1, 2006, through July 31, 2009) that automatically renewed for two more years unless either party gave notice of its election not to renew ninety days before the end of the initial contract.  Under the Contract, Cyphermint agreed to provide (1) interactive software enabling customers to use Defendant's services from the shipping spots and (2) advertising software for Defendant's retail partners.  Cyphermint received $0.35 for each transaction and shared revenues from any coupons or advertisements with Defendant.

Of most significance to this case is Section 10 of the MSA, which governs termination of the Contract.  Section 10.3 reads:

3

> **Termination of DHL Shipping Spot Project**. In
> addition to the other termination rights set forth
> in this Section 10, CI may terminate CI Services
> in the event that DHL elects to cease supporting
> the DHL Shipping Spot Project.

(Dkt. No. 29, Ex. 3, MSA ¶ 10.3.)  Section 10.5 governs

termination fees:

> **Termination Fees**. There shall be no termination
> fees for any termination by either party,
> irrespective of the reason for such termination,
> except for a "Material Breach" or as provided
> pursuant to the "Statement of Work."

(<u>Id.</u> at ¶ 10.5.)  The SOW contains the following provision

concerning termination fees:

> Should DHL terminate this agreement for any reason
> other than a material breach by Cyphermint before
> its termination date DHL agrees to compensate CI
> in the amount of $50,000 per month for each month
> remaining in the initial term.

(Dkt. No. 29, Ex. 4, SOW at 16.)  Plaintiff suggests that

this $50,000 per month termination fee was drafted to

protect its predecessor Cyphermint's considerable up-front

investment in software development.  Consequential damages,

including lost profits, are not at issue in this case, as

the Contract expressly excludes any such damages.  (Dkt. No.

29, Ex. 3, MSA ¶ 9.1.)

C.  <u>Termination</u>.

4

In August 2008, in the midst of the downward spiral of the global economy, Cyphermint's creditors filed an involuntary bankruptcy petition against it. A month later, Cyphermint's assets, including the Contract, were sold to Plaintiff, the highest bidder, for $161,500 and an earn-out equal to one percent of gross revenues for 2009 and 2010. In purchasing these assets, Plaintiff assumed Cyphermint's obligations, rights, and liabilities under the Contract.

Later that year, as a further result of the global recession and weak economy, Defendant decided to discontinue all domestic delivery services within the United States. In November 2008, Plaintiff learned of this plan, which would necessarily eliminate all shipping spots, and on November 12, Plaintiff's counsel sent a letter requesting that Defendant "kindly confirm that DHL intends to terminate the agreement on Friday, November [21], 2008, at 3:00 p.m. EST." (Dkt. No. 19, Am. Compl. ¶ 35.) On November 16, Defendant responded that "shipping will cease on November 21." (<u>Id.</u> ¶ 37.) On December 8, Plaintiff sent a letter confirming the termination and requesting early termination fees in the amount of $413,333.33. Defendant refused to pay, and this

litigation ensued.

### III. <u>PROCEDURAL BACKGROUND</u>

Plaintiff filed a complaint on July 27, 2010, in Berkshire County Superior Court,[1] and Defendant removed the action to this court shortly thereafter. Plaintiff's amended complaint contains the following counts: (I) breach of contract; (II) breach of the implied covenant of good faith and fair dealing; (III) unjust enrichment; (IV) violation of the Florida Deceptive and Unfair Trade Practices Act; (V) breach of express warranty; and (VI) violation of Mass. Gen. Laws ch. 93A. Defendant now moves for judgment on the pleadings on all counts, and Plaintiff moves for judgment on the pleadings as to Count I.

### IV. <u>DISCUSSION</u>

A. <u>Legal Standard</u>.

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is evaluated much like a motion to dismiss under Rule 12(b)(6). <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008). "Because a Rule 12(c) motion

---

[1] Defendant has consented to personal jurisdiction in Massachusetts. (Dkt. No. 29, Ex. 3, MSA ¶ 11.4.)

calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom." Id. (citation omitted). "Under Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), to survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion), a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Id.

B.    Count I: Breach of Contract.

Florida law governs the Contract. (Dkt. No. 29, Ex. 3, MSA ¶ 11.4.) Under Florida law, the elements of a breach of contract are (1) a valid contract, (2) a material breach, and (3) damages. Abbott Lab., Inc. v. Gen. Elec. Capital, 765 So.2d 737, 740 (Fla. 5th D.C.A. 2000). "[T]he interpretation of a written contract is a matter of law to be determined by the court." DEC Elec., Inc. v. Raphael Const. Corp., 558 So.2d 427, 428 (Fla. 1990). "[T]he language used in a contract is the best evidence of the

intent and meaning of the parties." Merin Hutner Codman, Inc. v. Wackenhut Corr. Corp., 941 So.2d 396, 398 (Fla. 4th D.C.A. 2006) (citation omitted). When contractual language is clear and unambiguous, courts must construe the document "as written," and terms must be given their plain meaning. Id.

Plaintiff argues that Defendant breached the Contract by ceasing all shipments under the Contract prior to its expiration and failing to pay the resultant termination fees pursuant to Section 10.5. Under Section 10.5, termination fees only arise in case of "a 'Material Breach' or as provided pursuant to the 'Statement of Work.'" (Dkt. No. 29, Ex. 3, MSA ¶ 10.5.) The SOW states, "[s]hould DHL terminate this agreement for any reason other than a material breach by Cyphermint before its termination date DHL agrees to compensate Cyphermint in the amount of $50,000 per month for each month remaining in the initial term." (Dkt. No. 29, Ex. 4, SOW at 16.) Given Defendant's concession that it did not terminate the agreement as a result of a material breach

by Cyphermint,[2] Plaintiff reasons that Defendant was obligated to pay Plaintiff $50,000 per month for the remainder of the initial term.

Defendant responds that it never "terminated" the agreement and that, rather, it merely reduced the number of shipping spots pursuant to express language in the Contract. Defendant points to Section 2.8 of the MSA:

> Limitations on Scope of Obligations. Nothing in this Agreement guarantees the number or placement of DHL Shipping Spot(s). DHL hereby acknowledges that the number of DHL Shipping Spots, [and] the placement, movement, and/or access of such units is solely within the discretion of DHL. . . .

(Dkt. No. 29, Ex. 3, MSA ¶ 2.8.)  Accordingly, Defendant argues that "[w]hen DHL made the global decision to cease its entire United States operations, it exercised its contractual discretion to limit its business with Newco to zero."  (Dkt. No. 26, Def.'s Mem. Supp. at 1.)

Plaintiff has the stronger argument.  Contrary to Defendant's interpretation, finding that Defendant terminated the agreement by ending its support for the

---

[2] Defendant's answer admits that Cyphermint "fully performed under the DHL Contract and at no time was in material breach of the contract."  (Dkt. No. 19, Am. Compl. ¶ 31; Dkt. No. 24, Answer ¶ 31.)

shipping spot project does not render meaningless Section 2.8.  Section 2.8 vests Defendant with the discretion to control the number and placement of the shipping spots, but it does not, as Defendant suggests, permit Defendant to stop performing altogether for any reason or no reason, with no consequences.  Such a construction is strained on its face and, when placed in context, is obviously contrary to the Contract's intent.  It is also contrary to good sense.  The proposition that reducing the shipping posts to zero is <u>not</u> the same as "termination" is Looking-Glass logic, recalling Humpty Dumpty's remark that "When <u>I</u> use a word . . . it means just what I choose it to mean -- neither more nor less."  Lewis Carroll [Charles L. Dodgson], <u>Through the Looking-Glass</u> 72 (1872).

     As noted, Section 10 of the Contract -- the termination provision itself -- incorporates by reference clear language in the SOW declaring that Defendant may <u>not</u> terminate the agreement except in the case of a material breach by Plaintiff.[3]  (<u>See</u> Dkt. No. 29, Ex. 3, MSA ¶ 10.5.)  Thus,

---

     [3] Of course, had Defendant merely reduced the scope of the shipping spot project somewhat, rather than eliminating it entirely, this might be a closer call.

viewing the document as a whole -- *i.e.*, from the perspective the court is obliged to take -- disposes of Defendant's over-labored interpretation.  <u>See</u> <u>Lambert v.</u> <u>Berkley S. Condo. Ass'n</u>, 680 So.2d 588, 590 (Fla. 4th D.C.A. 1996) ("In reviewing a document, a court must consider the document as a whole, rather than attempting to isolate certain portions of it.").

Notably, even if the court were to accept Defendant's argument that Section 2.8 gave Defendant blanket authority to reduce or even eliminate the shipping spot project altogether, the outcome would remain the same.  The relevant provision in the SOW provides for termination fees without regard to whether the termination was authorized.  The only restriction placed on the recovery of such fees is that they will not be available in the case of a material breach by Cyphermint.  (Dkt. No. 29, Ex. 4, SOW at 16 ("Should DHL terminate this agreement <u>for any reason other than a</u> <u>material breach</u> by Cyphermint . . . .") (emphasis added).)

Defendant next argues that deeming its action a termination renders Section 10.3 nonsensical.  Section 10.3 reads:

> **Termination of DHL Shipping Spot Project**. In
> addition to the other termination rights set forth
> in this Section 10, CI may terminate CI Services
> in the event that DHL elects to cease supporting
> the DHL Shipping Spot Project.

(Dkt. No. 29, Ex. 3, MSA ¶ 10.3.)  Defendant reasons that

Plaintiff's interpretation would effectively rewrite this

provision to read "CI may terminate CI Services in the event

that DHL [terminates the agreement]."  Defendant concludes

that this interpretation is nonsensical and cannot be what

the drafters intended.  However, this section merely

identifies one possible remedy available to Plaintiff upon

notification that Defendant intends to terminate the

agreement: Plaintiff may stop performing as well.

Significantly, by stating "in addition to the other

termination rights set forth in this Section 10," the

provision expressly provides that DHL's election to end the

shipping spot project triggers Plaintiff's "other

termination rights," thus offering powerful support for

Plaintiff's position.

Defendant's final argument relies on Section 9.1, the

Contract's limited liability provision, which prohibits

recovery of consequential damages.  Section 9.1 reads in

relevant part: "<u>except as specifically set forth in the agreement</u>, in no event will either party be liable under any theory of liability for any indirect, incidental, punitive, exemplary, or consequential damages of any kind or nature whatsoever . . . ."  (Dkt. No. 29, Ex. 3, MSA ¶ 9.1 (emphasis added, caps removed).)  As the above discussion demonstrates, this exception undermines Defendant's argument, as Section 10 specifically discusses the recovery of termination fees.

Ultimately, Defendant fails to explain how reducing the shipping spots to zero is in <u>any</u> way different from terminating the Contract.  As the Supreme Court recently observed, "[t]he word 'terminate' ordinarily means 'put an end to.'"  <u>Mac's Shell Service, Inc. v. Shell Oil Prods., Co. LLC</u>, 130 S. Ct. 1251, 1258 (2010) (quoting <u>Webster's New International Dictionary</u> 2605 (2d ed. 1957)).  The entire focus of the Contract was the shipping spot project, and Defendant does not contend that the Contract governed any other business operation that continued after shipping ceased.  Defendant's statement to Plaintiff that "shipping will cease on November 21," (Dkt. No. 19, Am. Compl. ¶ 37)

13

immediately ended performance by both parties.  Although

Defendant did not expressly declare "DHL hereby terminates

this Contract," its words and conduct had that very purpose

and effect.

Regardless of the label Defendant uses, the undeniable

effect of its actions was to bring the parties' performance

to an immediate and permanent halt.  A termination by any

other name would end the contract just the same.

In sum, Defendant's termination of the Contract

manifestly triggered Plaintiff's termination rights,

including termination fees of $50,000 per month for the

remaining term.  (See Dkt. No. 29, Ex. 3, MSA ¶ 10.5; Dkt.

No. 29, Ex. 4, SOW at 16.)  The failure to pay such fees

constitutes a breach of contract as a matter of law.

Accordingly, Plaintiff's motion will be allowed, and

Defendant's motion will be denied as to Count I.[4]

---

[4] Defendant has understandably not raised Section 10.4
of the MSA, which allows one party to terminate the contract
when the other party files for bankruptcy, as Cyphermint did
here.  (Dkt. No. 29, Ex. 3, MSA ¶ 10.5.)  This provision
contains the caveat that "either party shall not have the
right to exercise such termination so long as the other
continues to perform without interruption or a noticeable
diminution in its performance hereunder."  (Id.)  There has
been no suggestion that Plaintiff was unable to perform

14

C.   Count II: Implied Covenant of Good Faith and Fair
     Dealing.

     "Under Florida law, the implied covenant of good faith
and fair dealing is a part of every contract." <u>Burger King
Corp. v. C.R. Weaver</u>, 169 F.3d 1310 (11th Cir. 1999).  The
covenant must relate to the performance of an express term
of the contract, and it is not "an abstract and independent
term of a contract which may be asserted as a source of
breach when all other terms have been performed pursuant to
the contract requirements."  <u>Id.</u> (citation omitted).  A
cause of action for breach of the implied covenant cannot be
maintained "(a) in derogation of the express terms of the
underlying contract or (b) in the absence of breach of an
express term of the underlying contract."  <u>Id.</u>

     Defendant argues that Plaintiff's cause of action for
breach of the implied covenant of good faith contradicts the
express terms of the contract and is therefore barred.  In
support, Defendant reiterates its primary contention that
the contract affords Defendant total discretion to reduce or
eliminate the shipping spot project without a penalty.

_____

after being forced into bankruptcy.

However, because the express terms of the contract are not susceptible to such an interpretation, for the reasons set forth above, this argument must fail.

Moreover, as Plaintiff notes, the Eleventh Circuit has made clear that the implied covenant of good faith is implicated by an alleged abuse of discretion by one of the contracting parties.  See Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1291 (11th Cir. 2001) ("With the implied covenant, one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations.").  Here, Plaintiff asserts that in addition to breaching the Contract, Defendant abused its discretion to limit the number and location of shipping spots under Section 2.8 by eliminating the project entirely and then failing to pay Plaintiff a termination fee.  This allegation fits neatly within the settled case law.  Consequently, Defendant's motion will be denied with respect to Count II.

D.    Count III: Unjust Enrichment.

"A quasi-contractual claim fails upon a showing that an express contract exists."  Berry v. Budget Rent-A-Car Sys.,

<u>Inc.</u>, 497 F. Supp. 2d 1361, 1369 (S. D. Fla. 2007).
Plaintiff argues that its unjust enrichment claim is an
alternative inconsistent pleading, which is permitted at
this stage in the litigation.  <u>See</u> Fed. R. Civ. P. 8(d)(2)
(permitting alternative inconsistent pleadings).

It is true that "until an express contract is proven, a
motion to dismiss a claim for . . . unjust enrichment on
these grounds is premature."  <u>Borchardt v. Mako Marine
Intern., Inc.</u>, 2009 WL 3856678 (S.D. Fla. Nov. 17, 2009)
(citation omitted).  Yet, "[w]hile a party can plead breach
of contract and unjust enrichment in the alternative, a
party is nonetheless precluded from pleading unjust
enrichment where, as here, the existence of an express
contract is not in doubt."  <u>Validsa, Inc. v. PDVSA Servs.,
Inc.</u>, 632 F. Supp. 2d 1219, 1243 (S.D. Fla. 2009), <u>rev'd on
other grounds</u>, No. 10-11209, 2011 WL 1519116 (11th Cir. Apr.
21, 2011); <u>see also</u> <u>Shibata v. Lim</u>, 133 F. Supp. 2d 1311,
1318 (M.D. Fla. 2000) ("Florida law does not generally
permit a party to pursue a cause of action on an express
contract at the same time as he pursues a cause of action
for unjust enrichment.").

Given that the parties agree on the existence of an
17

express contract, (Dkt. No. 19, Am. Compl. ¶ 7; Dkt. No. 24, Answer ¶ 7), Defendant's motion will be allowed with respect to Count III.

E.   Count IV: Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

The FDUTPA declares unlawful any "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Sta. § 501.204(1).  A FDUTPA claim contains three elements: (1) a deceptive act or practice; (2) causation; and (3) damages.  Bookworld Trade, Inc. v. Daughters of St. Paul, Inc., 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007).  An act likely to mislead consumers is a "deceptive act," and a practice that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers is an "unfair practice" under FDUTPA.  Id.

Plaintiff alleges that it was induced to accept payment for its services via a per-transaction fee, with the promise of early termination fees (rather than up-front development and licensing fees) if Defendant abandoned the project. Plaintiff asserts that Defendant's inducement, in conjunction with its subsequent refusal to honor the terms

18

of the Contract, constitutes a violation of FDUTPA.

In response, Defendant incorrectly asserts that the Act only protects individual consumers.  In fact, "consumer" is "broadly defined" such that the act applies "to any act or practice occurring in the conduct of any trade or commerce even as between purely commercial interests."[5]  <u>Bookworld Trade, Inc.</u>, 532 F. Supp. 2d at 1364.  While condemning Plaintiff's allegations as "formulaic" and "conclusory," (Dkt. No. 31, Def.'s Reply at 9, 11), Defendant presents no good reason for the court to enter judgment on this count at this stage and, thus, Defendant's motion will be denied with respect to Count IV.

F.    <u>Count V: Breach of Express Warranty</u>.

To prove a breach of an express warranty, Plaintiff must satisfy three elements: (1) breach, (2) causation, and

---

[5] Defendant's reliance on <u>Kertesz v. Net Transactions, Ltd.</u>, 635 F. Supp. 2d 1339 (S.D. Fla. 2009) for the proposition that Plaintiff is not the type of "consumer" protected by the FDUTPA is misplaced.  <u>Kertesz</u> held that "consumer" specifically excludes parties not engaged in any type of business transaction, which is not an issue here.  <u>Id.</u> at 1349 (preventing the plaintiff from bringing FDUTPA claim in a defamation action against owners of a pornographic website given that she had not transacted any business with the defendants).  In fact, <u>Kertesz</u> expressly stated that "remedies available to individuals are also available to businesses."  <u>Id.</u> (citation omitted).

(3) damages. <u>Kia Motors Am. Corp. v. Butler</u>, 985 So.2d
1133, 1140-41 (Fla. 3d D.C.A. 2008). Here, Plaintiff
alleges:

> DHL expressly warranted to Cyphermint, and to
> [Plaintiff] as successor-in-interest, that DHL
> would not do any act or make any grant, assignment
> or agreement that would or might conflict or
> interfere with Cyphermint/[Plaintiff's] complete
> enjoyment of all rights under the DHL Contract;
> would use best efforts to assist and cooperate
> with Cyphermint/[Plaintiff] and to use
> commercially reasonable efforts to cooperate with
> Cyphermint/[Plaintiff].

(Dkt. No. 19, Am. Compl. ¶ 64.)  Defendant argues that
these allegations are vague and fail even to identify
particular provisions in the Contract that create such
express warranties.  Defendant acknowledges, however, that
this pleading appears to be a hybrid of Sections 2.4, 2.5,
and 6.1 of the Contract, which read as follows:

> 2.4  <u>Cooperation and Coordination</u>. DHL will use
> commercially reasonable efforts to cooperate and
> coordinate its activities, and those of its
> subcontractors, with CI, DHL and DHL's other
> vendors within the DHL Shipping Spot Project in
> order to implement any CI Services via DHL Kiosk.
>
> 2.5  <u>DHL Cooperation</u>. To the extent that any
> development, testing, implementation or
> maintenance of any CI Services requires the
> assistance, cooperation and consent of DHL, DHL
> agrees to use its best efforts to provide such
> assistance, cooperation or consent on a timely
> basis.

> 6.1 <u>Mutual Representations and Warranties</u>.
> Each party represents and warrants to the
> other that . . . (c) it has not done and
> will not do any act and has not made and
> will not make any grant, assignment or
> agreement that will or might conflict or
> interfere with the complete enjoyment of
> all of the other party's rights under
> this Agreement.

It is true, as Defendant observes, that these provisions are broadly worded. Nonetheless, Plaintiff's chief allegation that Defendant flagrantly abused its discretion under the Contract to limit the number and placement of shipping spots -- by terminating the project entirely and then refusing to pay the clearly applicable penalty -- states a plausible claim for breach of warranty and is therefore sufficient to survive a motion to dismiss. This claim is more than sufficient to mandate denial of Defendant's motion as to Count V.

G. <u>Count VI: Violation of Mass. Gen. Laws ch. 93A, Section 11</u>.

Chapter 93A provides a cause of action to "a person who is engaged in business and who suffers a loss as a result of an unfair or deceptive act or practice by another person also engaged in business." <u>Manning v. Zuckerman</u>, 444 N.E.2d 1262, 1264 (Mass. 1983) (citation omitted). Like the

FDUTPA, this statute defines "persons" subject to liability under § 11 to include both individuals and business entities. Mass. Gen. Laws ch. 93A, § 1(a). "Among the myriad ways in which to qualify as a violator of c. 93A is to fail to disclose a fact to the plaintiff, the disclosure of which may have influenced a person not to enter the transaction." 31 Mass. Prac. Equitable Remedies § 28.6 (3d ed.).

Here, as in Count IV (alleging violation of FDUTPA), Defendant challenges Plaintiff's allegations as formulaic and lacking adequate particularity. Defendant further argues that, as a "simple breach of contract," the facts of this case will not support a Chapter 93A claim. See Incase Inc. v. Timex Corp., 488 F.3d 46, 56 (1st Cir. 2007) ("Simple breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A."). While Defendant's argument has some force, it would be premature at this time to dismiss this count. Defendant's contentions may be revisited following discovery via a motion for summary judgment, or at the conclusion of Plaintiff's evidence at trial.

V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings (Dkt. No. 25) is hereby ALLOWED as to Count III and DENIED as to Counts I, II, IV, V, and VI. Plaintiff's Cross-Motion for Partial Judgment on the Pleadings (Dkt. No. 28) is hereby ALLOWED. Counsel will submit a joint written status report with a proposal for future proceedings no later than August 15, 2011.

It is So Ordered.

                                    /s/ Michael A. Ponsor
                                    MICHAEL A. PONSOR
                                    U. S. District Judge